# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANTHONY DAVID ATKINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14 cv 9923 |
| v. ) | |
| ) | Judge Sharon Johnson Coleman |
| SG AMERICAS SECURITIES, LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant SG Americas Securities, LLC ("SGAS"), filed a motion for summary judgment [154], arguing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law on the remaining three counts of plaintiff Anthony David Atkinson's complaint. This Court heard oral arguments on the motion on November 4, 2016. For the reasons stated below, this Court grants the motion.

**Background**

The following facts are taken as true and undisputed for purposes of ruling on the instant motion. As discussed below, plaintiff failed to respond to SGAS' Local Rule 56.1(a)(3) Statement of Undisputed Facts in compliance with L.R. 56.1(b)(3) and therefore the Court deems admitted the facts in SGAS' L.R. 56.1(a)(3) statement. L.R. 56.1(b)(3)(C).

SGAS and its predecessor firms, including Newedge USA, LLC, employed David Atkinson from August 2002 until January 14, 2015. (SGAS' L.R. 56.1(a)(3) Statement of Undisputed Facts, Dkt. 157 at ¶1). SGAS is a futures commodity merchant that provides its customers with electronic trading software platforms, trade clearing services, and trading support. (*Id.* at ¶3). Between August 2002 and February 2013, Atkinson was an eSolutions Support Analyst or eTrading Support Analyst on the Trade Mitigation Team ("TMT") in the eSolutions Department. (*Id.* at ¶4). TMT provides

1

telephone support to external customers and internal SGAS traders, known as "business lines," to resolve issues with eTrading, such as online access to trading systems, confirmation of executed trades, and adjustments to customers' trading limits. (*Id.* at ¶5). Atkinson's work station was on the eSolutions floor in SGAS' Chicago office, which contained 35 to 40 other eSolutions employees. (*Id.* at ¶7). Each eSolutions team, including TMT and Administration, had its own dedicated area on the eSolutions floor. (*Id.*). The Administration team generally performs back-office software and eSolutions support functions, and typically does not deal directly with customers. (*Id.* at ¶8).

1. *Atkinson's Medical Leave and Return to Work*

In October 2011, Atkinson was hit by a car and was on medical leave due to his injuries, including permanent loss of hearing in his left ear. (*Id.* at ¶¶9-10). His physician released him to work without restrictions on December 1, 2011. (*Id.*). Atkinson successfully resumed his duties upon returning to work. (*Id.* at ¶11).

Approximately three months later, in March 2012, Atkinson suffered a brain hemorrhage while on vacation, which required a second medical leave. On August 7, 2012, Atkinson's father emailed SGAS (then Newedge) to notify them that Atkinson "is doing quite well and would like to return to work soon," and asked what the company would require for him to return. (*Id.* at ¶13). The company proposed a return date of August 20, 2012, and stated that it would need a doctor's release stating "any special conditions or accommodations for Anthony [Atkinson]'s return to work, if any." (*Id.*). Atkinson's father informed the company that August 20 was too soon. (*Id.* at ¶14). The company did not require Atkinson to return work. (*Id.*). On September 19, 2012, Atkinson's doctor sent SGAS a return to work release, stating that "Mr. Anthony David Atkinson may return to work for 6 hour days from 9/20/12 through 9/30/12 and full time thereafter." (*Id.* at ¶15). The release did not specify any ongoing work restrictions or describe any hearing, speech, balance, or other

2

disabilities. (*Id.*). SGAS requested Atkinson return to work as of October 1, 2012, which he did. (*Id.* at ¶12, 16).

Prior to his return to work, Atkinson informed Human Resources representative Lisa Foster that his doctor would like him to start with 6-hour days at first, but he agreed to return full-time on October 1, 2012. (*Id.* at ¶17). Foster responded, "If you need to work a shorter day at first because of your doctor's recommendation it is totally fine. Let's see how it goes. We are glad to have you back." (*Id.* at ¶18). Atkinson returned to work on October 1 in the same position as an eSolutions Support Analyst with TMT at the same pay without taking any shortened days. (*Id.*).

After Atkinson's return to work, SGAS began receiving complaints from several external customers and business line representatives about Atkinson's handling of their calls to the eSolutions' support line. (*Id.* at ¶21). Vendors and exchanges also complained about interactions with Atkinson, causing his then-manager Greg Stephens to require Atkinson to seek permission before contacting vendors. (*Id.* at ¶22). SGAS received more complaints about Atkinson's performance after his return from medical leave than it had received before he went on leave. (*Id.* at ¶23). The complaints continued during the fourth quarter of 2012 and into 2013. (*Id.*). SGAS regularly records support calls for quality assurance for review in case of complaints. (*Id.* at ¶24). Stephens reviewed recordings of some of Atkinson's support calls to determine if the complaints were well-founded and he found that the complaints were valid. (*Id.*). The complaints included Atkinson not providing requested information to clients and failing to escalate complaints to a manager when he was unable to answer. (Dkt. 158-1, Stephens Tr. at 182-83).

*2. Performance Evaluation and Reassignment*

SGAS generally conducts its performance evaluations for the preceding year in January. (*Id.* at ¶26). In January 2013, Stephens delivered Atkinson's annual performance evaluation for 2012. (*Id.*). The review took into account Atkinson's performance issues since his return to work, provided

some criticism, and gave him an overall rating of 2 (out of 5)- "Meets Some but Not All Expectations." (*Id.*). In February 2013, management assigned Atkinson to a project on the Administration team because they believed it would be a better fit since the project did not involve direct customer contact, was less time-sensitive, and was less stressful. (*Id.* at ¶27). Atkinson's title of eSolutions Support Analyst and pay did not change with the assignment on the Administration team. (*Id.* at ¶28). The Administration team manager, Jason Sutton, gave Atkinson more discrete "static data" analysis tasks on the project because Atkinson was having some performance difficulties on his new team in February and March 2013. (*Id.* at ¶29).

In August 2013, Atkinson was permanently assigned to the Administration team and his title changed to eSolutions Static Data Analyst. (*Id.* at ¶30). He remained in this position until leaving SGAS in January 2015. (*Id.*). According to Sutton, Atkinson was better able to perform the duties of this position, although he did identify some areas for improvement in 2013 and 2014. (*Id.* at ¶31). Atkinson admitted in his deposition that Sutton was "a fair man" and that there "probably" was some legitimacy to Sutton's critiques. (*Id.*).

In November 2014, Newedge announced its merger with SGAS effective in early January 2015. (*Id.* at ¶74). All Newedge employees were required to sign a form SGAS employment agreement if they intended to continue their employment after the merger. (*Id.*). Employees who failed to sign the document would be deemed to have resigned. (*Id.*). Atkinson refused to sign the employment agreement because he did not agree with the arbitration clause, among other provisions. (*Id.* at ¶75). SGAS agreed to waive the arbitration clause. (*Id.*). Atkinson still refused to sign the agreement. (*Id.*). SGAS therefore considered Atkinson to have resigned as of January 14, 2015. (*Id.* at ¶76). As a result of his resignation, Atkinson did not receive any severance benefits. (*Id.*). Three other Newedge employees also refused to sign the employment agreement. (*Id.* at ¶78). All three were deemed to have resigned and none received severance packages. (*Id.*).

*3. Requests and Accommodations*

In March 2012, Atkinson's work station was in the far left corner of the TMT area, where he had his left ear towards the wall. (*Id.* at ¶33). Prior to his return from medical leave in October 2012, his previous corner workstation had been dismantled and was no longer available to anyone. (*Id.* at ¶34). Upon his return to work, Atkinson chose a workstation near his prior location that was closer to other TMT and Administration team members. (*Id.* at ¶35). Greg Stephens, the TMT supervisor in October 2012, was not aware of Atkinson's hearing loss and believed the new workstation near other employees would help Atkinson's transition back on the team. (*Id.* at ¶36).

On January 6, 2013, Atkinson submitted a formal internal complaint to SGAS personnel, including his manager Stephens and Human Resources representative Lisa Foster. (*Id.* at ¶79). In this complaint, Atkinson stated that he had suffered two traumatic brain injuries over a 15 month period and had lost hearing in his left ear. (*Id.*). The complaint further asserted that SGAS had failed to accommodate him by not giving him his old workspace in the corner, and had harassed and discriminated against him by not giving him systems access or a regular schedule. (*Id.* at ¶80). Foster investigated the complaint and confirmed with Stephens that Atkinson had what he needed to do his job. (*Id.* at ¶81).

On January 9, 2013, Stephens and Foster met with Atkinson to discuss his complaint. (*Id.* at ¶82). At the meeting, Atkinson's only request for accommodation was a change of seating due to his hearing loss. (*Id.*). Atkinson made other requests unrelated to his hearing, including a set work schedule, instead of variable, an ergonomic keyboard, and use of his old PC as his main computer.[1] (*Id.* at ¶83). All of Atkinson's requests were granted. (*Id.*). Immediately following this

---

[1] Prior to Atkinson's return from medical leave on October 1, 2012, SGAS upgraded the computers for all of its employees in eSolutions. (*Id.* at ¶46). Atkinson's two desktop PCs that he had been using for approximately 10 years were replaced by a laptop upon Atkinson's return. (*Id.*). Atkinson found his old PC and asked Stephens if he could use it. (*Id.* at ¶47). Stephens allowed him to use his old PC when necessary, but the laptop was intended to be Atkinson's main computer given the upgrades. (*Id.*). Atkinson also found his old file cabinet and notebook, which he was able to use.

5

meeting, Atkinson sent Foster a 12-page email that began, "The harassment stops now" and repeated the same complaints that SGAS had already addressed in the meeting. (*Id.* at ¶84). On January 22, 2013, Foster sent Atkinson an email confirming that SGAS had moved Atkinson's workspace to better accommodate his hearing loss, had provided the other things he had asked for in his formal complaint, and reiterated that SGAS is committed to giving him access, training, tools to do his job. (*Id.* at ¶85).

Stephens and his manager, Graham Hughes, met with Atkinson to discuss his concerns again. (*Id.* at ¶88). Hughes emailed Atkinson on February 8, 2013, stating that they have accommodated Atkinson, but will continue to work with him if he has concerns. (*Id.*). Atkinson continued to raise the same complaints. (*Id.* at ¶89).

In February 2013, when Atkinson was assigned to the Administration team, his supervisor Sutton moved him closer to the Administration team and Sutton's office. (*Id.* at ¶39). Sutton asked the Administration team to make efforts to speak into Atkinson's functioning ear. Atkinson's new workspace had his co-workers to his right and behind him. (*Id.* at ¶40). This initial workspace with the Administration team was a temporary desk because a "permanent" desk was not available when Atkinson joined the team. (*Id.* at ¶42). Atkinson was seated at the temporary desk from February 2013 until January 2014. Although the workstation was smaller than a permanent desk, there was enough space for Atkinson's computer, telephone, and several monitors. (*Id.*).

Atkinson claims that his temporary desk was under a vent that blew cold air onto him, aggravating his wrists and ankles. (*Id.* at ¶44). The eSolutions room had temperature variations, drafts, and vents. Non-disabled supervisor, Erica Brown, was also frequently cold. (*Id.*). Jason Zdora, a non-disabled temporary staff member, used the same temporary desk to which Atkinson

---

(*Id.*). Atkinson submitted an internal complaint, asking to use his PC as his main computer because his laptop was having problems. (*Id.* at ¶48). SGAS allowed him to use his PC instead of the laptop. (*Id.*).

was assigned. (*Id.* at ¶43). In January 2014, a permanent desk opened up in the Administration team area and Atkinson was moved to that desk until his employment ended. (*Id.* at ¶45). Atkinson testified that the permanent desk addressed his concerns about workspace and drafts. (*Id.*).

In June 2013, SGAS informed Atkinson that he would have to undergo an independent medical evaluation ("IME") to determine if any further accommodation was medically necessary because Atkinson had not provided any medical documentation to support his requests. (*Id.* at ¶90). SGAS told Atkinson that an IME would not be necessary if he confirmed that he had no medical accommodation need beyond his hearing. (*Id.* at ¶91). Atkinson neither made such a confirmation nor did he submit to an IME. (*Id.*). Atkinson told SGAS he would provide doctor's notes, which SGAS allowed him to do. (*Id.* at ¶92). Atkinson provided two notes. One note, dated June 28, 2013, stated that "due to his left sided hearing loss he needs appropriate seating accommodations." (*Id.* at ¶93). The second note, dated July 2, 2013, stated that Atkinson "needs time to be able to schedule appointments for ongoing medical care and also a consistent work schedule. Additionally, he needs an ergonomic keyboard and should not be using computer monitors that flash heavily." (*Id.* at ¶94). SGAS's position is that it had already provided the accommodations requested in the notes. (*Id.* at ¶94).

*4. Other Complaints and Accommodations*

When Atkinson returned to work after his medical leave in October 2012, SGAS provided him with access to TMT systems and all standard work tools, including internet access, email, and access to internal eSolutions databases that contained TMT and Administration systems and tools. (*Id.* at ¶49). SGAS did not remove any systems access that Atkinson had prior to his medical leave. (*Id.* at ¶51). Atkinson was not provided with access to every eSolutions system, but no employee was provided with such access. (*Id.* at ¶52). Management decides what access employees need based on their duties. (*Id.* at ¶54). Atkinson had access to some systems that other employees did not have and

7

Atkinson admitted that he does not know what systems other TMT employees had access to. (*Id.*). Atkinson's managers and Human Resources representative Lisa Foster confirmed that Atkinson had the tools need to do his job. (*Id.* at ¶51).

If employees could not access a system, lacked a password, or needed help, they were able to obtain shared login and passwords from colleagues, managers, the IT help desk, exchanges or vendors. (*Id.* at ¶51). Stephens took steps to provide Atkinson with access and equipment when he learned Atkinson was having issues. (*Id.* at ¶57). Atkinson has not presented any evidence that Stephens or anyone else denied him access to systems, logins, passwords, or other tools. (*Id.*). Atkinson testified that Stephens was not a good manager and did not understand what everyone needed, but admitted he was making efforts to help him. (*Id.* at ¶58).

SGAS does not provide specific training for employees on most eSolutions systems, but employees must learn on the job, using their knowledge, material on SGAS databases, and their colleagues for assistance. (*Id.* at ¶60). Atkinson received the same training opportunities as other employees and has offered no evidence of non-disabled employees who were offered more training. (*Id.* at ¶61).

In March 2012, Atkinson's work schedule was 6:00 a.m. to 2:30 p.m. to provide early morning TMT coverage for certain customers outside the United States. (*Id.* at ¶66). During Atkinson's leave, SGAS changed its practices, including providing non-U.S. customers with eSolutions assistance from non-U.S. personnel. (*Id.*). When Atkinson returned to work in October 2012, his start time varied between 6:30 a.m. and 7:15 a.m. depending on business needs. (*Id.* at ¶67). In January 2013, Atkinson requested a regular schedule with a 6:00 a.m. start, which Stephens gave him. (*Id.* at ¶68). The TMT team had no business need for Atkinson to start at 6:00 a.m. (*Id.*). Only one other employee started that early and he was in a different role. (*Id.*).

8

When SGAS reassigned him to the Administration team, his supervisor Sutton gave him a regular schedule with a 6:45 a.m. start. (*Id.* at ¶69). There was no business need for Atkinson to start earlier than 6:45 a.m. and that is the time that Sutton started work. (*Id.*). Atkinson claimed that he needed an earlier start time for therapy sessions four times per week, but he did not provide any medical documentation requiring a specific work schedule. (*Id.* at ¶70). SGAS indicated to Atkinson that it would make accommodations for specific appointments if he engaged with them to adjust his schedule. (*Id.* at ¶72). Atkinson admitted in his deposition that he was never prevented from going to any appointments. (*Id.* at ¶73).

Atkinson also complains that he did not receive raises, but only two staff members received salary increases between 2012 and 2015. (*Id.* at ¶¶96-98). SGAS asserts that business conditions prevented salary increases and a reduction in bonuses during this time period. (*Id.* at ¶¶96-99). Atkinson's overtime hours and overtime pay increased each year from 2011 to 2014. (*Id.* at ¶100). SGAS kept Atkinson's medical information in confidential files and only shared limited information with employees on a need to know basis, particularly with regards to Atkinson's hearing loss. (*Id.* at ¶102). Atkinson himself informed several managers and coworkers at SGAS that he had suffered a traumatic brain injury and lost hearing in his left ear. (*Id.* at ¶102). SGAS sent Atkinson COBRA paperwork to continue his health coverage after his January 2015 separation from the company, but he never filled it out. (*Id.* at ¶105).

**Legal Standard**

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004). The standard places the

9

initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as true and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 244.

**Discussion**

*1. Local Rule 56.1*

*Pro se* litigants are not held to the same stringent standards expected of attorneys. However, the Court is entitled to expect conformity with its orders and with the local rules. Here, Atkinson's opposition brief is thirty-five pages, which exceeds the additional page-limit that the Court allowed of each party. Additionally, Atkinson's brief failed to conform to font size, margins, and line spacing requirements contained in Local Rule 5.2(c). The Court would be within its discretion to strike the brief in its entirety, though the Court declines to do so.

*2. Count I: ADA Failure to Accommodate*

SGAS argues that it is entitled to summary judgment on Count I because SGAS fully accommodated Atkinson's disability. "A plaintiff claiming failure of reasonable accommodation must show: '(1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability.'" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 224 (7th Cir. 2015) (quoting *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013)). The ADA sets forth three ways in which an individual may assert a statutory disability: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12131(1).

SGAS argues that it was only required to reasonably accommodate Atkinson's hearing loss because Atkinson never gave them notice of other disabilities and the medically necessary accommodations. He never mentioned other impairments in a doctor's note or provided any evidence of disability apart from the hearing loss. He also did not include them in his January 6, 2013, internal complaint or his EEOC charge. *Ekstrand v. School Dist. Of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) ("[T]he ADA demonstrates that a reasonable accommodation is connected to what the employer knows about the employee's precise limitations. See 42 U.S.C. § 12112(b)(5)(A)."). Thus, the only disability that Atkinson established is deafness in his left ear.

SGAS argues that it reasonably accommodated Atkinson's disabling hearing loss. On both the TMT and Administration teams, SGAS located Atkinson's workstation near his co-workers, who were instructed to communicate with him by walking to him and speaking into his functioning ear. SGAS further asserts that it accommodated Atkinson in other ways by giving him six months leave in 2012, providing time off for medical appointments, and giving him every item requested in his doctor's notes (regular start time, ergonomic keyboard, non-flashing monitors). Atkinson did not return to work until his physician cleared him to do so. SGAS did not rush Atkinson's return to work and told him he could work shorter days initially.

Atkinson asserts that SGAS should have returned him to his prior work space in a corner that allowed him to have his left ear against a wall. Atkinson's other demands, like requests for "tools" and "training," were unsupported by any medical need or were wholly unrelated to any disability or medical condition. The ADA does not entitle a disabled employee to the accommodation of his choice. *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015). Additionally, "an employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job." *Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013). Atkinson admits that he was able to perform all the essential functions of his job.

This Court grants summary judgment in favor of SGAS on Count I because it made efforts to reasonably accommodate Atkinson's hearing disability. Furthermore, Atkinson has not presented evidence that specific medical needs required other accommodations. Atkinson also admits that he was able to perform his job.

*3. Count II: Disability Discrimination*

SGAS moves for summary judgment on Count II, arguing that Atkinson fails to show that he suffered an adverse employment action and also fails to show a causal connection between any

11

alleged action by SGAS and Atkinson's disability. The Seventh Circuit Court of Appeals in *Ortiz v. Werner Enterprises, Inc.,* __ F.3d __, 2016 WL 441434 (7th Cir. Aug. 19, 2016), overrules several opinions that use the framework of the "convincing mosaic," which the court believes needlessly complicates the employment discrimination analysis. Instead, the court held, the question is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's protected class, in this case disability, caused an adverse employment action. *Id.* "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself-or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.*

"In a discrimination case, a materially adverse employment action is one which visits upon a plaintiff a significant change in employment status. Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (internal citations omitted). Atkinson fails to establish any adverse employment action.

First, the record shows that SGAS did not terminate his employment. Instead, he resigned from his job by refusing to sign the employment agreement that all employees were required to sign after the merger between Newedge and SGAS. The record indicated that the three other Newedge employees who refused to sign the employment agreement were likewise deemed to have resigned and did not receive severance. Second, Atkinson's reassignment to the Administration team was not a demotion or other type of "adverse action" for discrimination purposes because it was at the same pay and with a comparable "Analyst" title. SGAS contends the move was better suited to Atkinson's skills at that time. SGAS refers to customer and business line complaints as part of what led to Atkinson's negative performance evaluation in January 2013 and subsequent reassignment.[2]

Atkinson's other claimed adverse actions, including failing to provide certain training, COBRA coverage, AD&D insurance coverage, and therapy among other things, do not constitute adverse employment actions. He admits that he cancelled some training sessions that had been

---

[2] Atkinson asserts that these service complaints are hearsay. However, the complaints do not constitute hearsay in this instance because they are not offered for their truth. Instead, SGAS relies on the complaints to show that it received complaints directed at Atkinson's conduct. *See* Fed.R.Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted). The complaints are also admissible as a hearsay exception to show SGAS' motive for Atkinson's negative performance evaluation and for transferring him to a different team. Fed.R.Evid. 803(3).

offered, admits that he never filled out the COBRA paperwork, and admits that he did not complete forms for AD&D coverage. Moreover, none of these complaints constitute adverse employment action because Atkinson cannot show material harm resulted from these actions. *See Traylor v. Brown*, 295 F.3d 783, 788-89 (7th Cir. 2002). "[N]ot everything that makes an employee unhappy will suffice to meet the adverse action requirement." *Id.*

SGAS also argues that Atkinson cannot establish that the alleged discrimination was on the basis of disability. SGAS argues that even if Atkinson could show an adverse employment, there is no evidence from which a reasonable fact finder could conclude that his left ear deafness (or any other alleged condition) was the "but-for" cause of any adverse action. *Serwatka v. Rockwell Automation, Inc.*, 591 F3d 957, 962 (7th Cir. 2010). Without being able to establish an adverse employment action for which his disability is a "but-for" cause, Atkinson cannot establish discrimination. This Court finds nothing in the record connecting the various claimed adverse actions to Atkinson's hearing loss or other claimed disabling conditions. Accordingly, this Court grants summary judgment in favor of SGAS on Count II.

*4. Count III: ADA Retaliation*

SGAS argues that it is entitled to summary judgment on Count III because Atkinson can establish neither an adverse action nor can he show a causal link between the adverse action and a protected activity. To establish retaliation based on a disability, Atkinson must present evidence, direct or circumstantial of an adverse employment action causally connected to a protected activity, for example complaining about a lack of accommodation. *See Anderson v. Donahoe*, 699 F.3d 989, 994-995 (7th Cir. 2012). In the context of retaliation the standard to determine whether an action is adverse is whether it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918. Title VII does not establish a code of civility for the workplace. "[Title VII's] anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners. An employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 918-19.

Atkinson cannot establish retaliation caused by his engagement in a protected activity. Even if this Court assumes that the negative performance evaluation that Atkinson received in January 2013 or his reassignment to a different team within the company in February 2013 were adverse employment actions there is no evidence, direct or circumstantial, that either were connected to his complaints about the accommodations he received. Although there was close temporal proximity between his negative performance evaluation in January 2013 and his February 2013 reassignment to

the Administration team following his formal internal complaint submitted on January 6, 2013. SGAS regularly performed its employee reviews in January for the prior year. Not every instance of close temporal proximity of a complaint and a change in employment constitutes retaliation because there are many factors that contribute to employment decisions. Further, Atkinson admitted much of the conduct that was contained in the service complaints and, even if they were an inaccurate reflection of Atkinson's work, SGAS reasonably relied on the complaints in good-faith. Moreover, Atkinson does not claim that SGAS retaliated against him in his performance reviews for 2013 and 2014, but only the performance review for 2012 (performed in January 2013). In order to establish retaliation, more is required than simply timing. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (Suspicious timing alone is rarely sufficient to establish causation.) This Court grants summary judgment on Count III since Atkinson cannot connect his disability or requests for accommodation or internal complaints about lack of accommodation to any retaliatory action.

**Conclusion**

This Court does not discount in any way the severity of plaintiff's injuries. Despite his injuries, plaintiff ably represented himself in this matter. However, there is no evidence in the record establishing a factual question for a jury to resolve. Based on the foregoing discussion, this Court grants summary judgment in favor of defendant SGAS. Civil case terminated.

IT IS SO ORDERED.

ENTERED:

Dated: December 12, 2016

SHARON JOHNSON COLEMAN
United States District Judge